IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANNISE V. MARTIN,<br>　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>EXELON CORPORATION, formerly<br>known as "PECO ENERGY COMPANY,"<br>　　　　　　Defendant. | CIVIL ACTION<br><br><br><br>NO.  14-5749 |

DuBois, J.                                              February 9, 2016

**M E M O R A N D U M**

## I.　　INTRODUCTION

This is an employment discrimination case. Plaintiff Annise V. Martin alleges that her former employer, defendant PECO Energy Company ("PECO"), discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq*., 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. § 951, *et seq.* Presently before the Court is PECO's Motion for Summary Judgment, filed December 18, 2015. For the reasons that follow, the Court denies the Motion.

## II.　　BACKGROUND

The relevant facts as set forth in the parties' briefs and accompanying exhibits are summarized as follows. The facts are not contested except as otherwise noted.

### A.　Background of Martin's Employment at PECO

Plaintiff Martin is a black woman. Compl. ¶ 5. Martin worked for PECO for twenty-three years. Pl.'s Statement of Facts ¶ 153. In October 2007, Martin was promoted to the position of Senior Business Analyst in PECO's Contract Controls Department. Def.'s Statement of Facts ¶ 6; Compl. ¶ 9. The position of Senior Business Analyst is a "grade level 3" position in PECO's

grading system, which means that the employee is "accountable," "task-oriented," "self-directed," and requires "very little supervision." Def.'s Statement of Facts ¶ 10.

The Contract Controls Department manages numerous outside contractors used by PECO, and oversees and audits contractor performance. Def.'s Statement of Facts ¶ 7. The Contract Controls Department was created in 2007 by the Department's first manager, Tricia Cox. Def.'s Statement of Facts ¶ 6. At that time, the Contract Controls Department was overseen by Doreen Masalta, who was then the Director of Project, Contract, and Vegetation Management. Def.'s Statement of Facts ¶ 8. Cox and Masalta together hired Martin for the newly-created Senior Business Analyst position. Def.'s Statement of Facts ¶ 8.

In July 2008, Kimberly Busa became Manager of Contract Controls and replaced Cox as Martin's direct manager. Compl. ¶ 10. At that time, Masalta was Director of the Vegetation Management Department and the Contract Controls Department, overseeing both Busa and Frank Moffa, who was Manager of Vegetation Management. Def.'s Statement of Facts ¶ 9. Masalta, Cox, Busa, and Moffa are white, as were Martin's peer coworkers in Vegetation Management and Contract Controls. Pl.'s Statement of Facts ¶ 154. Martin was the only black employee in the Vegetation Management and Contract Controls Departments. Pl.'s Statement of Facts ¶ 154.

### B.  2008 Performance Review

PECO employees complete two performance reviews with their supervisors annually, a mid-year review and an end-of-year review. Prior to joining Contract Controls, Martin received consistently positive performance reviews, and was rated each year as a "significant contributor." Pl.'s Statement of Facts ¶ 153. In her 2007 end-of-year review, Martin was rated "B, Significant

Contributor." Pl.'s Statement of Facts ¶ 153. At that time, Cox was Martin's direct supervisor. Def.'s Statement of Facts ¶ 6.

In her 2008 end-of-year review, Martin's overall performance was rated "B, Meets Expectations." Def.'s Statement of Facts ¶ 32; Ex. I. Busa was Martin's direct supervisor at that time and conducted the review with Martin. Def.'s Statement of Facts Ex. I. In the reviews, Martin was rated on her "Performance on Goals (Results)" based on her progress in achieving performance-based targets on particular tasks. Busa rated Martin either "B+ Exceeds Expectations" or "B Meets Expectations" for most of Martin's goals that year. Def.'s Statement of Facts Ex. I. Martin was rated "B minus Partially Meets Expectations" on four of these sub-ratings. *Id.* One of her Performance on Goals targets required Martin to ensure that monthly "Contractor Scorecards" were accurately updated. *Id.* Martin was rated "B minus Partially Meets Expectations" for her work on this goal. *Id.* Busa stated in the review that "[Martin] continues to utilize other departments and peers in accomplishing this goal. This is a difficult task since all incidents do not get reported under our group and some are not reported timely. For 2009, [Martin] should play a bigger role in this process and take ownership knowing obstacles will exist."

Martin was also rated on her "Performance on Value Based Behaviors" based on her performance on six categories: (1) safety, (2) integrity, (3) diversity, (4) respect, (5) accountability, and (6) continuous improvement. Martin received a rating of "B minus Partially Meets Expectations" on three of the six "Value Based Behaviors." Specifically, Martin was rated "B minus" on "Integrity," with the following comment:

> [Martin] acts in the best in interest of the company. [Martin] should focus going forward on the task at hand and not let negativity derail her. Documentation and presentation of issues can help in accomplishing this.

3

Def.'s Statement of Facts Ex. I. For "Respect," Martin was also rated B minus, and Busa explained,

> [Martin] has a strong work commitment and values her peers. [Martin] should focus on the goal at hand and not let difficult issues or people interfere and work ways to show the importance and value of task in question [sic].

Def.'s Statement of Facts Ex. I. Martin was also rated "B minus" on "Continuous Improvement."

Busa commented,

> [Martin] is very energetic about learning new things but should become completely successful in her current goals prior to testing new waters. This will help her achieve a successful career path. [Martin] could find a linkage with an interest and her current task [within] the company to satisfy her thirst for knowledge. Additionally, she should focus on specific areas she takes interest in.

Def.'s Statement of Facts Ex. I.

### C.  2009 Work in Contract Controls

Martin and Busa dispute the nature of their working relationship. Martin describes Busa's management style as "very degrading." Pl.'s Statement of Facts Ex. 4, at 26. Martin claims that Busa micromanaged her work and that there was "no flexibility." Pl.'s Statement of Facts Ex. 4, at 26-27. In addition, Martin believes that Busa refused to take accountability for her own mistakes and attempted to pass off errors or omissions on her subordinates, particularly Martin. Pl.'s Statement of Facts Ex. 4, at 32. Martin describes the relationship as "a child-to-parent" relationship, in which she had to "ask for everything" and where Busa "needed you to come to her . . . in order to complete your daily task." Pl.'s Statement of Facts Ex. 4, at 37.

In contrast, Busa describes Martin as unreceptive to feedback. Def.'s Statement of Facts ¶ 59. Specifically, Busa describes an occasion on which Martin left the room when Busa offered constructive criticism. *Id.* Masalta, Busa's supervisor, also believes that Martin refused to accept help or to change her performance in response to suggestions from management. Def.'s Statement of Facts ¶¶ 12-17.

4

Beginning in 2009, Busa put Martin in charge of redesigning PECO's Contractor Information Web Page ("CIWP"). Def.'s Statement of Facts ¶¶ 24. CIWP was originally an internal PECO website that contained documents regarding PECO procedures for working with outside contractors. Def.'s Statement of Facts ¶ 21. Martin was tasked with converting CIWP into an external resource that contractors could use to access the documents. *Id.* Busa asked Martin to create a "project plan" using project management software to set deadlines for the progress of the CIWP enhancement. Def.'s Statement of Facts ¶ 22. Busa rejected several versions of the project plan prepared by Martin as inadequate. Def.'s Statement of Facts ¶ 25.

At some point late in 2009, Busa took approximately six weeks of maternity leave. Def.'s Statement of Facts ¶ 19. During the time Busa was on leave, Frank Moffa, Manager of the Vegetation Services Department, took over as Martin's direct supervisor. *Id.* Moffa was therefore responsible for conducting Martin's 2009 mid-year review, which took place on November 23, 2009. Pl.'s Statement of Facts ¶ 155. At PECO, the terms "on track" and "off track" are used to describe employee performance during mid-year reviews. Def.'s Statement of Facts ¶ 31. At that review, Moffa rated Martin "on track" for all of her goals. Pl.' Statement of Facts ¶ 155; Ex. 22. With regard to the CIWP project, Moffa noted that

> [Martin is] [o]n track for updating new data into CIWP but issue has come to light on Standards and Processes having multiple versions and confusion with the Contractors as to the most recent and could pose a risk to [PECO]. [Martin] is working on resolving this issue. Timeline to be provided.

*Id.* Martin was also rated "on track" in each of the Value Based Behaviors (safety, integrity, diversity, respect, accountability, and continuous improvement). *Id.* Masalta claims that this review did not accurately reflect all of the issues with Martin's performance at that time because "[Moffa] stepping in didn't have the history that [Busa] had with [Martin's] performance." Def.'s Statement of Facts Ex. A, at 69.

5

On December 9, 2009, Masalta, Moffa, and Martin had a meeting regarding Martin's progress on the CIWP updates. Def.'s Statement of Facts ¶ 23. At the meeting, the two supervisors reviewed with Martin a spreadsheet in which Martin had recorded the tasks and projects on which she was working. Def.'s Statement of Facts Ex. H. Both supervisors explained to Martin that they believed she was spending too much time on producing routine reports and therefore was not making adequate progress on the CIPW project. *Id.* In Moffa's contemporaneous memorandum of the meeting, he noted that "[Masalta] explained that [Martin] was brought in to this role [as Senior Business Analyst] with high expectations, with an MBA, and the output that we see is not nearly the level that is expected." *Id.* Moffa noted that Martin did not take this feedback well and became "very emotional." *Id.*

At this December 9, 2009, meeting, Martin alleges that she told Masalta and Moffa that she was working for ten hours a day to complete her assignments. Pl.'s Statement of Facts Ex. 4, at 59-60. Martin claims that Masalta told her that she should be able to complete her assignments in an eight-hour workday. *Id.* Masalta asserts that she spoke with Martin on multiple occasions about time management and stressed the importance of project plans with deadlines that were reported to other departments within PECO. Def. Statement of Facts Ex. A, at 67-68.

The CIWP project was completed by the end of 2009 as originally requested and the new website went live in January 2010. Pl.'s Statement of Facts ¶ 23.

### D.  2009 Year-End Review

Prior to preparation of Martin's 2009 year-end review, Masalta, Busa, and Moffa met to discuss Martin's performance. Def.'s Statement of Facts Ex. 4, at 69. At these meetings, the supervisors talked about Martin's year-end rating in the context of "is she [Martin] a 'B minus [Partially Meets Expectations]' or is she off track completely." *Id.* Masalta stated that the

supervisors believed that Martin was "still trending down after the mid-year" review." *Id.* at 70. The three supervisors agreed that rather than give Martin a "C" rating, which would have resulted in Martin receiving no salary increase or bonus for 2009, that she would receive a B minus rating. *Id.*

On February 3, 2010, Busa gave Martin her 2009 end-of-year review. Pl.'s Statement of Facts ¶ 156. Frank Moffa also attended the meeting. Def.'s Statement of Facts ¶ 42. Martin's overall rating for the year was "B minus Partially Meets Expectations." Def.'s Statement Of Facts Ex. K. Martin received a mix of "B Meets Expectations" and "B minus Partially Meets Expectations." in the "Performance on Goals (Results)" section. Busa rated Martin's performance as "B minus Partially Meets Expectations" in several areas. Specifically. Busa rated Martin "B minus Partially Meets Expectations" on the performance of the goal relating to Martin's oversight of the CIWP. *Id.* at 4. In her comments, Busa explained that

> [Martin] has been updating CIWP timely and accurately but she is not in compliance with procedure PC-ED-2018 as to maintaining and updating the procedure log . . . . This does not meet policy and could lead to potential risk with Contractors referencing material posted to the CIWP that is dated. This was brought to [Martin's] attention on a few occasions including her Mid Year review . . . . The redesign [of CIWP] was complete in November and has received numerous positive feedback from Contractors and internal Peco staff. [Martin] provided very little in documentation and communication of her updates in the redesign, even when prompted very little information on strategy and deliverables was provided . . . . [Martin] should focus on communicating her results more frequently and surveying her users (CIWP) as to what is working well and not working so well. Additionally, monthly statistical summaries of CIWP usage was only provided for a few months. This data was requested by our Director to assess Contractor usage.

*Id.* Martin was also rated "B minus Partially Meets Expectations" on her performance of three goals requiring her to coordinate certain reports about contractor performance. *Id.* at 5. With regard to one goal, Busa noted that "[Martin] should be more proactive in her responses rather than reactive." *Id.* Martin was assigned to create reports on compliance with Occupational Safety

and Health Administration regulations and Busa observed that there were "reoccurring formula errors with reporting of the OSHA hours and reporting gaps of incident reporting rolled up to the Scorecard. [Martin] should document her results in a timely manner and communicate as such." *Id.* at 6.

In the "Performance on Value Based Behaviors" section, Martin was rated "B Meets Expectations" on four out of six categories. *Id.* at 8-10. However, Busa rated Martin "C Does Not Meet Expectations" on "respect." *Id.* at 9. Busa explained this rating,

> While [Martin] displays respect with her peers, she tends to respond defensively when approached with issues that involve her. Some instances of this were during the CIWP annual review in May and on several occasions when addressed about administrative issues involving unscheduled vacation. [Martin] needs to display respect for management and address issues professionally not in an open forum with peers present. Additionally, if management feels the need to meet on a specific issue, the call for a meeting should signify the importance. As an individual contributor, it's expected that [Martin] can manage her own work schedule as well as her paid time off. [Martin] also needs to work on communicating and reporting regularly to management as to her results on projects and daily job task [sic].

*Id.* at 9.

At one point in the meeting, Busa intended to give Martin a clean copy of the written year-end review but inadvertently handed Martin her own copy of the review with her handwritten notes. Def.'s Statement of Facts Ex. M., at 10. Next to Busa's typed explanation of the "C Does Not Meet Expectations" rating for the "respect" value, Busa had written in the word "yoyo" with a star next to it. *Id.*; Pl.'s Statement of Facts Ex. 23. Busa claims that this word referred to a toy yo-yo and was a note to herself to "speak to [Martin] during [Martin's] performance appraisal saying that her inconsistencies in her performance were up and down." Def.'s Statement of Facts Ex. M, at 10. Martin claims that she spoke to Busa about the "yoyo" note at the meeting and that Busa refused to explain it. Pl.'s Statement of Facts Ex. 4, at 191-92.

During the review, Martin disagreed with many of the evaluations of her performance. Def.'s Statement of Facts ¶¶ 44-45. Over the course of the meeting, Martin became upset, and she left prior to the completion of the review. Def.'s Statement of Facts ¶ 44. In her subsequent written comments on the year-end review, Martin stated that "in my 23 [years] of service I have never received a [review] that was unprofessional, subjective, and offensive with a malicious intent. The unprofessional comment hand written suggesting I am a 'yoyo' [sic] . . . . Therefore, I disagree with the contents of the [review.]" Def.'s Statement of Facts Ex. K, at 11.

### E.  Martin's Internal Complaints Regarding 2009 Year-End Review

Immediately after the February 3, 2010, performance review, Martin went to Monica Wrenn, a manager in PECO's human resources department, and complained about the "yoyo" comment. Pl.'s Statement of Facts ¶ 158; Def.'s Statement of Facts ¶ 126. Wrenn told Martin that she believed the comment referred to Martin's "up and down" performance, but referred Martin to her assigned human resources representative, Joseph Docimo. Pl.'s Statement of Facts ¶ 158; Def.'s Statement of Facts ¶ 126. Martin told Docimo that she believed that the "yoyo" comment was discriminatory and based on her race. Pl.'s Statement of Facts ¶ 159.

Busa was told by PECO human resources employees that Martin had complained about the "yoyo" comment being discriminatory. Pl.'s Statement of Facts ¶ 160. Docimo spoke with Busa on February 19, 2010, and told Busa that he believed Martin was going to drop the complaint. Pl.'s Statement of Facts ¶ 161. However, Docimo followed up with Busa on February 24, 2010, after speaking with Martin, and told Busa that Martin was "not going to drop the issue." Pl.'s Statement of Facts ¶ 162.

### F.  Pennsylvania Human Relations Commission Complaint

On May 3, 2010, Martin filed a race discrimination complaint with the Pennsylvania Human Relations Commission ("PHRC"). Pl.'s Statement of Facts ¶ 164. In the PHRC complaint, Martin claimed that Masalta, Busa, and Docimo had created a hostile work environment and discriminated against her based on her race. Pl's Statement of Facts Ex. 24. Martin also alleged that Docimo neglected to adequately pursue and investigate her allegations of discrimination. Pl.'s Statement of Facts ¶ 163. PHRC served PECO with the complaint on May 18, 2010. Pl.'s Statement of Facts ¶ 164. Busa cannot recall when she became aware of the PHRC complaint, but several other PECO employees testified that they first became aware of the complaint in the summer of 2010. Pl.'s Statement of Facts ¶¶ 165-166.

### G.  Martin is Placed on a Performance Improvement Plan

On May 13, 2010, Martin attended a meeting with Busa and Docimo. Pl.'s Statement of Facts ¶ 168. At the meeting, Busa informed Martin that Martin was being placed on a "performance improvement plan" ("PIP"). Pl.'s Statement of Facts ¶ 168. Busa gave Martin two forms, a copy of PECO's "Performance Improvement Plan Toolkit for Employees," which contains instructions on the preparation of PIP goals, and a blank "Weekly/Bi-Weekly Progress Update Form," to be completed by the employee at regularly scheduled intervals to self-assess performance on PIP goals. Def.'s Statement of Facts ¶ 70; Pl.'s Statement of Facts ¶ 70. Busa told Martin to prepare PIP goals in accordance with the Toolkit. Def.'s Statement of Facts Ex. M, at 94.

At the meeting, Martin was provided with a notice titled "Notification of Unacceptable Performance/Opportunity to Improve." Def.'s Statement of Facts Ex. O. That notice provided:

> This notice is written confirmation that I am providing you with an opportunity to improve your performance to meet minimal expectations. I have determined that

>your performance is unacceptable in several areas. You have received the following training/support/coaching to meet minimal expectations. However, you have been unable to demonstrate the necessary skills in these areas. . . . You are required to submit a draft PIP to me 7 (seven) days from Thursday, May 13, 2010. If you have any concerns about the PIP or you require additional guidance in following it, please let me know as soon as questions arise.

*Id.* The notice did not otherwise specifically describe Martin's deficient performance or the skills and training referred to. *Id.* Martin refused to sign the notice. Def.'s Statement of Facts ¶ 63.

The parties dispute what Martin was told about the reasons for the PIP at the meeting. Martin claims that she was told only that she was being put on a PIP because she had failed to submit her 2010 performance goals on time. Pl.'s Statement of Facts ¶ 63. Martin also claims that she did not know what tasks Busa wanted her to perform to be successful in completing the PIP. Pl.'s Statement of Facts ¶ 63. Busa and Docimo claim that Martin was told what goals she needed to work on and include in the PIP. Def.'s Statement of Facts Ex. E, at 60-62; Def.'s Statement of Facts Ex. L, at 100-101.

On May 17, 2010, Martin sent an email to Busa and Docimo seeking clarification regarding the PIP. Pl.'s Statement of Facts Ex. 6, at 3. In the email, Martin explained, "I am really confused and need to better understand the process so that I can be successful in fulfilling your request. The document provided was very vague and provided very little guidance . . . ." *Id.* Martin followed up with another email to Busa on May 19, 2010. Def.'s Statement of Facts Ex. V, at 9. In that email, Martin stated

>As per our conversation this morning in your office at 5:56 AM you expressed that you had already provided me with the answers to the below questions [regarding preparing the PIP]. I asked you specifically if you could provide me with clearer expectations and you replied "I have already given you those answers." I am still unclear of the issues regarding my performance and still need clarity.

*Id.* Docimo responded via email on May 20, 2010, and stated that "[i]t was pretty clear to me what was expected to be on the PIP and how it should be structured. The deficiencies were clearly spelled out on that document and reviewed several times at the Year End Meetings that were conducted." *Id.* at 2.

On May 20, 2010, Martin and Busa had a meeting to discuss Martin's draft PIP. Def.'s Statement of Facts Ex. V, at 13. Martin brought a draft PIP to that meeting, as required by the notice and Busa's instructions. *Id.* However, in an email sent later that day to Docimo and Bruce Fluehr, PECO's Manager of Project Management, Busa stated that the PIP was "very generalized." *Id.* Busa wrote that Martin informed her that she could not supply more detail in the PIP goals because Busa and Docimo had not answered her questions from her earlier emails. *Id.* Busa noted in the email that Martin "told me that she had to tell me that she felt that she was being harassed by both Joe Docimo and me and that she needed to talk to someone else about this process because in her view it was backwards and both Joe and I were not helping her because we didn't answer her questions." *Id.*

After this meeting, also on May 20, 2010, Busa prepared a PIP for Martin. Def.'s Statement of Facts Ex. M, at 101; Ex. Q. This PIP included three performance goals with specific measurements, time frames, and targets. Def.'s Statement of Facts Ex. Q. The first goal focused on contractor reports and badging. *Id.* The second goal, called "accountability," focused on communication with supervisors regarding time off and sick time requests and responding promptly to emails from others. *Id.* The third goal, "continuous improvement," included various CIWP related tasks. In addition, the PIP included a "competency (behavior) development plan" with a single goal: "respect management and my peers and to be actively open and receptive to feedback from others." *Id.*

12

### H.  Job Performance after the PIP

Martin's PIP was implemented beginning on June 16, 2010. Pl.'s Statement of Facts ¶ 171. After the PIP was implemented, Martin began meeting regularly with Busa to review her progress. Busa prepared biweekly and monthly Progress Update Forms explaining Martin's progress on each PIP goal. Def.'s Statement of Facts Ex. P, at 9. These reports were shared with Martin. Martin disputes Busa's characterization of the PIP process. Martin felt that "everything I have done [was] falling on deaf ears" and that "nobody [was] paying attention." Pl.'s Statement of Facts Ex. 4, at 287.

#### 1.    *June 16, 2010–June 30, 2010 Biweekly Report*

In the first report under the PIP, Busa observed that Martin "is off to a good start with providing reports and analysis that goes with them." Def.'s Statement of Facts Ex. P, at 30. However, Busa identified problems with respect to all three of Martin's performance goals. *Id.* at 28-30. Busa also explained "the one-on-one meeting was effective with [sic] providing more feedback in [sic] the expectations." *Id.* at 30.

#### 2.    *June 16, 2010–July 14, 2010 Monthly Report*

In the first monthly report, Busa rated Martin as "trending unfavorably." Def.'s Statement of Facts Ex. P, at 31. While Busa noted that Martin had "improved on some items," she explained that several reports prepared by Martin during the month had significant errors. *Id.* at 34. The report also explained, "[t]he expectation for future evaluation periods to be successful should be to correct all issues addressed above and provide dates and the form of communication on reports so there is no issue in finding the report." *Id.* at 34.

>    3.    *July 15, 2010–July 28, 2010 Biweekly Report*

On the first biweekly report in the next month, Busa rated Martin "on track" for all four goals. *Id.* at 35-37. However, Busa noted that Martin had failed to include one of the goals in her self-assessment and therefore observed that she would "watch [the] area because of omission." *Id.* at 35.

>    4.    *July 15, 2010–August 11, 2010 Monthly Report*

For the next monthly report, Busa evaluated Martin as "trending favorably." *Id.* at 38-41. Martin was evaluated as "on track" for two goals, and "off track" for two goals. *Id.* In her evaluation of one on-track goal, Busa wrote, "[Martin's] efforts in expediting PUC complaints may help our Regulatory group close out Vegetation Management cases that would normally take a few years. This is a great way to reach out and look for process improvements. . . ." *Id.* at 40. Both "off track" evaluations were caused by Martin failing to timely provide PIP reports to Busa. *Id.* at 39, 41. Busa explained that Martin "needs to remember that this Plan and the corresponding updates are her most important task and if there is a need for anything to interfere it needs to be brought to management's attention . . . ." *Id.* at 41.

>    5.    *August 12, 2010–September 1, 2010 Biweekly Report*

Busa rated Martin "on track" for all four goals on this report. *Id.* at 42-44. However, Busa also identified some areas that were still in need of improvement that would be followed up on the next report. *Id.* at 42.

>    6.    *August 12, 2010–September 15, 2010 Monthly Report*

On the final PIP report, Busa rated Martin as "off track" on all four goals, referencing various issues during the month. *Id.* at 45-48.

14

Martin claims that whenever she spoke with Busa or Docimo regarding the PIP and her performance, she was turned away and not provided guidance. Pl.'s Statement of Facts Ex. 4, at 291-93. Martin believes that she was not provided sufficient additional training and guidance to comply with the terms of the PIP. *Id.* at 293.

## I.   Martin's Termination and Subsequent Lawsuit

On July 8, 2010, the PHRC sent PECO a request for data and documents with regard to Martin's case. Pl.'s Statement of Facts ¶ 177. On July 16, 2010, PECO's counsel sent the PHRC its Verfied Answer and Affirmative Defenses. Pl.'s Statement of Facts ¶ 180. Docimo signed and verified the Answer. Pl.'s Statement of Facts ¶ 180. Busa testified at her deposition that she "may have" assisted with the preparation of the Answer to the PHRC. Pl.'s Statement of Facts Ex. 2, at 129.

Martin's PIP ended on September 15, 2010. Pl.'s Statement of Facts Ex. 2, at 132. Busa believed that at the time the PIP ended, Martin "did not successfully complete the plan based on the goals and behaviors in her plan." *Id.* at 129. Martin was terminated effective October 14, 2010. Def.'s Statement of Facts ¶ 148. To date, PECO has not hired a replacement employee for Martin's position. Def.'s Statement of Facts ¶ 67.

On December 30, 2010, counsel for Martin, Scott Pollins, Esquire, entered an appearance in the PHRC proceedings. Pl.'s Statement of Facts Ex. 19. In his notice of appearance, Pollins indicated that "on the basis of this notice, I request a copy of each document hereafter issued by the Pennsylvania Human Relations Commission in this matter." *Id.* Martin subsequently amended her PHRC complaint to include allegations of discrimination and retaliation culminating in her termination, and dual-filed this amended charge with the EEOC. Pl.'s Statement of Facts Ex. 20.

In February 2012, Martin moved from Philadelphia to Virginia and provided mail forwarding information to the United States Postal Service for her new address.

On August 23, 2013, the PHRC mailed a letter to PECO's counsel notifying PECO that it had investigated Martin's complaint and determined that it should be dismissed for lack of probable cause to support the allegations of unlawful discrimination. Def.'s Statement of Facts Ex. Z. On December 4, 2013, the EEOC mailed a Dismissal and Notice of Rights letter to Martin's Philadelphia address.

On October 9, 2014, Martin filed a Complaint in this Court. The Complaint includes claims of race discrimination in violation of Title VII, 42 U.S.C. § 1981, and PHRA (Count I), and claims of retaliation in violation of Title VII, 42 U.S.C. § 1981, and PHRA (Count II). This Court has jurisdiction pursuant to 42 U.S.C. § 1331 and § 1367. The gravamen of Martin's claims is that she was terminated from PECO because of her race and because of her PHRC complaint.

Following discovery, on December 18, 2015, PECO filed the instant Motion for Summary Judgment. In the Motion, PECO argues that (1) Martin's claims are time-barred because she failed to file the Complaint within ninety days of the mailing date of the EEOC's Dismissal and Notice of Rights letter, (2) Martin's claims of discrimination fail as a matter of law because no reasonable juror could conclude that Martin has established an inference of discrimination for a prima facie case under Title VII or that PECO's nondiscriminatory business reason is pretextual, and (3) Martin's claims of retaliation fail as a matter of law because no reasonable juror could conclude that her PHRC filings caused her termination.

## III.     APPLICABLE LAW

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

## IV.     DISCUSSION

### A.  Timeliness of Title VII Claims

PECO argues that Martin's claims under Title VII are untimely because they were not filed within ninety days of December 4, 2013, the date the EEOC mailed the Dismissal and Notice of Rights letter.[1] The Court rejects this argument.

42 U.S.C. § 2000e-5(f)(1) provides that "[i]f a charge filed with the Commission . . . is dismissed by the Commission, . . . the Commission . . . shall so notify the person aggrieved  and within ninety days after the giving of such notice a civil action may be brought against the

---

[1] The Court notes that this issue would not affect plaintiff's Section 1981 claims, which are subject to a four year statute of limitations. *Jones v. R.R. Donnelley*, 541 U.S. 369, 383-84 (2004).

respondent named in the charge." "[I]n the absence of other evidence, courts will assume that a plaintiff received her right-to-sue letter three days after the EEOC mailed it." *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 239 (3d Cir. 1999). However, "[w]hen the actual date of receipt is known, that date controls." *Id.* The three-day presumption is rebuttable, and the amount of evidence needed to rebut the presumption is "minimal" because "the presumption's only effect is to require the party contesting it to produce enough evidence substantiating [the date of receipt] to withstand a motion for summary judgment." *Vasquez v. Caesar's Paradise Stream Resort*, 524 F. App'x 831, 833 (3d Cir. 2013).

In addition, "it is settled that the ninety-day time limit in which a plaintiff must file a Title VII action is akin to a statute of limitations rather than a jurisdictional bar" and thus is subject to equitable tolling. *Seitzinger*, 165 F.3d at 349-40 (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)). Equitable tolling is appropriate if plaintiff has been "prevented from filing in a timely manner due to sufficiently inequitable circumstances." *Id.* at 340. "A litigant seeking equitable tolling bears the burden of establishing two elements: (1) that [she] has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way." *United States v. Bass*, 268 F. App'x 196, 199 (3d Cir. 2008).

The Court concludes that Martin has presented sufficient evidence to create a genuine dispute of material fact as to the date of receipt of the EEOC letter. Martin moved to Virginia after she filed the EEOC complaint but before the right to sue letter was mailed to her previous address in Philadelphia. Martin and her counsel both aver that they did not receive the EEOC letter at the time it was mailed, but only after Martin's counsel inquired with the EEOC about the status of her case. PECO has presented no evidence other than the EEOC letter itself that Martin or her counsel received the letter more than ninety days before the Complaint was filed.

Thus, the Court finds that Martin has presented sufficient evidence to rebut the presumption that she received the letter three days after the EEOC mailed it.

In addition, the Court concludes that equitable tolling is appropriate based on the facts of this case. First, Martin pursued her rights diligently under the circumstances. The EEOC took almost three years from the date of Martin's amended complaint to issue the Dismissal and Notice of Rights letter. During that time, Martin reasonably believed that her attorney was monitoring her case and would notify her of next steps as needed. The record demonstrates that as soon as Martin's counsel became aware of the EEOC's determination, Martin filed her Complaint in this Court. Second, the Court concludes that there are extraordinary circumstances justifying equitable tolling. The EEOC failed to mail the Dismissal and Notice of Rights letter to Martin's counsel, despite his entry of appearance and his express request that the agency do so. In addition, Martin could not have received the letter because it was mailed to an address where she had not lived for almost two years. *See Stallworth v. Wells Fargo Armored Servs. Corp.*, 936 F.2d 522, 525-26 (11th Cir. 1991) (equitably tolling the ninety day period in case in which "the primary fault for the failed delivery . . . rests upon the EEOC because of its failure to mail a copy of the right-to-sue letter to [plaintiff's] attorney").

### B.  Race Discrimination Claims

PECO argues that no reasonable jury could conclude that Martin has established a prima facie case of race discrimination or that PECO's legitimate business reason for termination was a pretext for discrimination. The Court rejects these arguments.

Summary judgment motions in Title VII cases are evaluated under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792, 802

(1973).[2] Under this framework, plaintiff has the burden of establishing a prima facie case of

discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 540 U.S. 248, 252 (1981) (citing

*McDonnell Douglas*, 411 U.S. at 802). If the plaintiff succeeds in proving the prima facie case,

the burden shifts to the defendant to "articulate some legitimate, non-discriminatory reason" for

the action. *Id.* Should the defendant carry this burden, the plaintiff then has the burden to prove

that the legitimate reason offered by the defendant was not its true reason, but instead "a pretext

for discrimination." *Id.*

Because Martin relies on allegedly favorable treatment of her white colleagues to

establish both her prima facie case and pretext, and PECO disputes that Martin's colleagues are

similarly situated, the Court first addresses whether Martin's proposed comparators are

similarly situated. The Court then evaluates the evidence submitted by Martin to establish a

prima facie case and pretext. The Court concludes that Martin's white colleagues are similarly

situated and that there are genuine disputes of material fact that preclude entry of summary

judgment.

### 1.   *Similarly Situated Comparators*

Martin identifies as comparators two of her coworkers in the Contract Controls and

Vegetation Management Departments, Stewart Griest and "Employee A."[3] PECO argues that

---

[2]     The same legal standard applies to Martin's claims under Title VII, Section 1981, and
PHRA. *See Fullard v. Argus Research Labs, Inc.*, No. 00-509, 2001 WL 632932, at *1 (E.D.
Pa. June 6, 2001) ("The legal standard for a section 1981 case is identical to the standard in a
Title VII case.") (citing *Lewis v. Univ. of Pittsburgh*, 725 F.2d 910, 915 n. 5 (3d Cir. 1983));
*Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013) ("[T]he PHRA is to be interpreted as
identical to federal anti-discrimination laws except where there is something specifically
different in its language requiring that it be treated differently." (citations and quotations
omitted)).
[3] The parties have agreed to use a pseudonym to refer to this employee.

these coworkers are not suitable comparators because they are not similarly situated to Martin. The Court disagrees.

A similarly situated employee does not need to be identically situated, but only "similarly situated in all relevant respects." *Wilcher v. Postmaster General*, 441 F. App'x 879, 881-82 (3d Cir. 2011). "A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Id.* at 882. "Whether comparators are similarly situated is generally a question of fact for the jury." *Abdul-Latif v. Cty. of Lancaster*, 990 F. Supp. 2d 517, 525 (E.D. Pa. 2014). Thus, to succeed on a motion for summary judgment, defendant must show that no reasonable jury could determine that the employees are similarly situated. *Id.*

In this case, Martin's proposed comparators are two of her colleagues in Contract Controls and Vegetation Management. Both proposed comparators reported to the same supervisor, Busa, and were overseen by the same management decision-makers.

In addition, Martin's comparators committed similar misconduct, though the degree of the misconduct is disputed. Martin avers that at the meeting at which she was initially put on the PIP, Busa told her that it was due to her failure to provide 2010 performance goals to Busa through PECO's internal personnel website. Pl.'s Statement of Facts ¶ 63. Martin's coworker, Stewart Griest, also failed to prepare and upload his goals to the internal website. Pl.'s Statement of Facts Ex. 15. However, Griest was not subject to any discipline for this failure, nor was he put on a PIP.

Employee A was also put on a PIP two years before Martin was placed on her PIP. Def.'s Statement of Facts ¶ 103. Employee A's PIP was also administered by Busa. Def.'s

21

Statement of Facts ¶ 104. Similarly to Martin, who was placed on a PIP partially because of errors and delays in producing reports, Employee A was placed on a PIP due to concerns about errors in corporate reports. Def.'s Statement of Facts ¶ 105. Busa believes that Employee A performed significantly better on her PIP than Martin did on her plan. Def.' Statement of Facts ¶¶ 110-111. However, after completion of the PIP, Employee A still received an annual rating of "B minus Partially Meets Expectations," the same rating that Martin received the year before she was terminated. Pl.'s Statement of Facts ¶ 111. Employee A was not terminated and is still employed at PECO.

PECO argues that these colleagues are not similarly situated because each member of the Contract Controls Department had very different job functions. The Court disagrees. While specific job duties varied, all of the members of the Contract Controls Department were evaluated on the same "Value-Based Behaviors." Pl.'s Statement of Facts Ex. 16, 23. In addition, both Martin and her comparators were evaluated on the timeliness and accuracy of their reports, though the reports covered different subject areas. Pl.'s Statement of Facts Ex. 16, 23. Thus, Martin was evaluated on the same general criteria as her coworkers in Contract Controls, despite having different job duties. Martin received similar ratings on her annual reviews as Employee A, but Employee A was not terminated. Pl.'s Statement of Facts ¶ 111.

While PECO argues that Martin's misconduct was more severe than her coworkers' and that this fact differentiates her from them, there are genuine disputes of material fact that prevent the Court from concluding as a matter of law that no reasonable jury could determine that Martin and her coworkers were similarly situated.

2.   *Prima Facie Case*

To establish a prima facie discrimination case, plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) the adverse action occurred "under circumstances that raise an inference of discriminatory action." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). The first three elements of Martin's prima facie case are not disputed. She is black and therefore a member of a protected class under Title VII, Section 1981, and PHRA. Defendant does not dispute that Martin was qualified for her position. Finally, Martin suffered an adverse employment action when she was terminated by PECO on October 14, 2010.

Regarding the last element, "[c]ommon circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside of the relevant class." *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999). As discussed above, Martin was treated differently from her similarly situated coworkers when her performance was reviewed and when her supervisors made decisions based on those reviews. This evidence is sufficient to support an inference of discrimination required to establish a prima facie case.

3.   *Nondiscriminatory Business Reasons*

PECO avers that Martin was fired because of her inconsistent performance as documented by her performance reviews and her failure to improve her performance during and after the PIP as documented by Busa's evaluations. This evidence satisfies PECO's low burden of demonstrating a legitimate, nondiscriminatory business reason for terminating Martin.

23

### 4. Pretext

PECO having met its burden of producing evidence of a legitimate, nondiscriminatory reason for Martin's termination, Martin must present sufficient evidence to create a genuine dispute of material fact that PECO's stated reason is a pretext for discrimination. To defeat a motion for summary judgment, plaintiff must either (1) discredit the proffered reasons for the adverse action, or (2) show that discrimination was more likely than not a motivating or determinative cause of the adverse action. *Snooks v. Duquesne Light Co.*, 314 F. App'x 499, 504 (3d Cir. 2009) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)). Plaintiff has the burden of identifying evidence of record based on which, when viewed in a light most favorable to plaintiff, "a factfinder reasonably could believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Perez v. N.J. Transit Corp.*, 341 F. App'x 757, 761-62 (3d Cir. 2009) (citations and quotations omitted). This evidence "need not include evidence of discrimination because in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Sala v. Hawk*, 481 F. App'x 729, 733 (3d Cir. 2012) (citations and quotations omitted). "Evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires [the Court] to ration the evidence between one stage or the other." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000).

Evidence of shifting explanations for the employee's termination can be used to establish pretext. *Id.* at 281. In addition, inconsistencies between the employer's reasons for termination and the employee's prior performance evaluations are evidence of pretext. *Sala v. Hawk*, 481 F. App'x 729, 733-34 (3d Cir. 2012) ("Sala's positive annual employment

evaluations raise serious questions of material fact as to whether the reasons articulated by Hawk in his memorandum merely served as a pretext for unlawful discrimination."). Finally, subjective evaluations on criteria such as "attitude" or "teamwork" are "more susceptible to abuse and more likely to mask pretext," and thus commonly create a genuine dispute of material fact precluding summary judgment. *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006); *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 320 (3d Cir. 2000).

In this case, Martin has identified similarly situated comparators who were treated differently from her. Griest and Martin committed similar misconduct, but Martin was placed on a PIP while Griest was not. Based on this, a reasonable juror could infer that PECO's reasons for placing Martin on the PIP and for setting certain goals on the PIP that Martin allegedly failed to meet were pretextual. Both Employee A and Martin were placed on PIPs, but Martin has shown that her performance was evaluated differently from under the PIP from the way Employee A's performance was evaluated. Employee A completed the PIP successfully in her supervisors' opinion, but was then rated "B minus Partially Meets Expectations" on that year's annual review. In contrast, Martin was rated on track for many of her goals in the PIP until the final evaluation, but was terminated just after the PIP concluded. Because Employee A's and Martin's PIPs were based largely on subjective criteria and not objective measurements, the difference in evaluation creates a genuine dispute of material fact as to whether the stated reasons for the PIP evaluations were pretextual.

In addition to the comparator evidence, Martin has identified inconsistencies in PECO's evaluations. Until Busa became Martin's supervisor in 2008, Martin never received a negative review in more than twenty years of employment with PECO. On her 2009 mid-year review with Moffa, Martin was rated almost entirely positively. Yet, less than three months later on her

2009 end-of-year review with Busa, Martin was rated negatively in some of the same areas, specifically her work on CIWP and on the "respect" subcategory of "Performance on Value Based Behaviors." Soon thereafter, Martin was placed on the PIP. Even during the PIP, Busa's evaluations of Martin's performance shifted over time. During several review periods on the PIP, Martin was rated entirely "on track," and only in the last evaluation of the period was she rated entirely "off track."

In addition, the subjective nature of many of Martin's evaluations creates a genuine dispute of material fact as to the credibility of defendant's proffered reasons for terminating Martin. Many of Martin's performance deficiencies mentioned in the 2009 review and PIP goals were focused on her attitude and her unwillingness to accept feedback. Martin disputes that her attitude was negative or unproductive, and alleges that Docimo and Martin would not tell her why they felt her attitude was overly "defensive" or help her understand the goals of the PIP. Because such subjective evaluations are "more susceptible to abuse and more likely to mask pretext," *Goosby*, 228 F. 3d at 320, the Court concludes that there is a genuine dispute of material fact as to the credibility of the evaluations on the "respect" criteria of Martin's reviews.

The Court concludes that Martin has identified sufficient circumstantial evidence to allow the trier of fact to reasonably disbelieve PECO's nondiscriminatory business reason for terminating her. Accordingly, the Court denies PECO's Motion for Summary Judgment on Martin's discrimination claims.

### C.  Retaliation Claims

PECO argues that Martin has failed to provide any evidence she was terminated in retaliation for her filing a claim of discrimination with the PHRC or for any other protected activity. The Court disagrees.

Like discrimination claims, retaliation claims are also evaluated under the *McDonnell Douglass* burden shifting framework. "To establish a prima facie retaliation claim under Title VII, plaintiff must demonstrate that (1) [she] engaged in protected activity; (2) after or contemporaneous with that protected activity, [she] was subject to a materially adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action." *Lebofsky v. City of Phila.*, 394 F. App'x 935, 938 (3d Cir. 2010) (footnote omitted) (citing *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)). If plaintiff establishes a prima facie case of retaliation, the burden of production shifts to defendant to offer a legitimate, non-discriminatory reason for the adverse employment action. *Marra*, 497 F.3d at 300-01. If the employer is able to satisfy this "relatively light burden," the burden of production shifts back to plaintiff, who must show, by a preponderance of the evidence, that the employer's explanation is pretextual. *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006). As with discrimination claims, the Court may consider the same evidence at both the prima facie and the pretext stages. *Farrell*, 206 F.3d at 286.

Temporal proximity between the protective activity and the alleged retaliation is highly probative of causation. *Id.* at 279. "[T]emporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not 'unusually suggestive' . . . ." *Id.* at 280 (quoting *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)). Without suggestive timing, a plaintiff may "substantiate a causal connection . . . through other types of circumstantial evidence that support the inference." *Id.* at 280-81. The same types of circumstantial evidence considered as evidence of pretext in a discrimination claim may be considered for pretext in a retaliation claim. *Sala*, 481 F. App'x at 733-34.

In this case, PECO avers that Martin has failed to produce evidence showing a causal connection between Martin's protected activity and her termination. Specifically, PECO avers that because five months passed between Martin's PHRC complaint and her termination, there is insufficient evidence of causation. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (concluding that two month temporal gap between protected activity and adverse action was insufficient *alone* to establish causation). However, Martin has provided a variety of other circumstantial evidence from which a jury could infer causation.

First, Martin identifies what she alleges was an escalating pattern of retaliation following her internal complaints about Busa. During Martin's February 3, 2010, review, Martin observed that Busa had referred to her as a "yoyo." Immediately following that review, Martin made internal complaints to PECO's human resources department. Martin was placed on the PIP in early May 2010. The relevant decision-makers at PECO, Busa and Docimo, became aware of Martin's PHRC complaint in July and Martin was terminated in October. Thus, Martin avers that her termination followed an escalating pattern of retaliation over the course of February to October 2010.

In addition, as discussed above with regard to Martin's discrimination claims, Martin has identified a white comparator on a PIP, Employee A, who was treated differently. Furthermore, Busa's evaluations of Martin during the PIP period were inconsistent, and Busa did not rate Martin as off track on all of the categories until the final evaluation of the PIP period. From this comparator evidence and the inconsistency in Busa's evaluations, in combination with the temporal proximity between Martin's complaints, the PIP, and her termination, a reasonable trier of fact could infer that Martin was retaliated against because of

her protected activity. Accordingly, the Court denies PECO's Motion for Summary Judgment on Martin's retaliation claims.

## V.      CONCLUSION

For the foregoing reasons, PECO's Motion for Summary Judgment is denied. An appropriate order follows.